IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BECKLEY DIVISION

UNITED STATES,

                Petitioner,

v.                          MISCELLANEOUS ACTION NO.  5:09-mc-00043

GERARD O'SHEA and
KATHNELL O'SHEA,

                Respondents.

MEMORANDUM OPINION AND ORDER

Before the Court are the United States' Petitions to Enforce Internal Revenue Service Administration Summons [Docket 1].[1]  For the reasons set forth below, the Petitions are **GRANTED IN PART** and **DENIED IN PART**.

*I.  BACKGROUND*

This matter arises from an ongoing investigation by the Internal Revenue Service (IRS) into the tax liability of Gerard and Kathnell O'Shea.  On October 2, 2008, IRS Revenue Officer Gregory Yurick served administrative summonses on the O'Sheas ordering them to appear before him to testify and produce documents and records regarding taxable income for the years 2002, 2003, and 2004.  The documents and records sought by Officer Yurick pertained to two trusts, the G and K

---

[1]  Miscellaneous case numbers 5:09-mc-00043 (Gerard O'Shea) and 5:09-mc-00044 (Kathnell O'Shea) have been consolidated.  All citations to the record contained herein refer to documents filed jointly in both cases and assigned an identical docket number in each respective case.

Trust and the Genesis Trust, allegedly administered by the O'Sheas.[2]  The O'Sheas appeared before

Officer Yurick at the designated time but refused to produce any documents or answer any questions.

The O'Sheas cited their Fifth Amendment privilege against self-incrimination as the reason for their

refusal to provide the requested information.

The Government filed the instant petitions on March 12, 2009, seeking to bring the O'Sheas

before this Court to show cause why they should not be compelled to provide the information

requested by the administrative summonses.  The Court found that the allegations contained in the

Government's petitions established a prima facie case that the summonses were issued in good faith

and presumptively enforceable.  (Docket 2.)  The parties were directed to submit briefing to the

Court and appear for a show cause hearing.  Briefs were filed and the Court heard arguments from

the parties on May 15, 2009.  The matter is now ripe for the Court's consideration.

## II.  DISCUSSION

To obtain judicial enforcement of an IRS summons, the Government must first make a prima

facie showing that the summons was issued in good faith.  *Conner v. United States*, 434 F.3d 676,

680 (4th Cir. 2006) (citing *United States v. Powell*, 379 U.S. 48 (1965)).  The summons will be

deemed to have been issued in good faith if "(1) the investigation is being conducted for a legitimate

purpose; (2) the inquiry is relevant to that purpose; (3) the information sought is not already in the

possession of the IRS; and (4) the administrative steps required by the Internal Revenue Code have

been followed."  *Id*.  The Government's burden is not onerous; it may be satisfied by an affidavit

from an IRS enforcement officer alleging that the four good faith elements have been satisfied.  *Id*.

Furthermore, the IRS possesses the "power of inquisition" to investigate possible unpaid tax

_____

[2]  The O'Sheas have not expressly admitted or denied that the trusts exist.

2

liabilities, and its inquisitory powers need not be supported by probable cause that wrongdoing has occurred.  *Powell*, 379 U.S. at 57; *see also United States v. Bisceglia*, 420 U.S. 141, 146 (1975) ("The purpose of the [summons] statutes is not to accuse, but to inquire.").  If the Government meets its burden of demonstrating that the summons was issued in good faith, "it is entitled to an enforcement order unless the taxpayer can show that the IRS is attempting to abuse the court's process."  *Conner*, 434 F.3d at 680 (quoting *United States v. Stuart*, 489 U.S. 353, 353 (1989)).

In marked contrast to the burden placed on the Government, the taxpayer bears a heavy burden to prove an abuse of process.  *See Alphin v. United States*, 809 F.2d 236, 238 (4th Cir. 1987). The taxpayer can establish that an abuse of process has occurred by disproving one or more of the four good faith elements averred by the Government.  *United States v. McHenry*, 552 F. Supp. 2d 571, 574 (E.D. Va. 2008).  Notwithstanding the Government's good faith, a taxpayer also may successfully resist an IRS summons by raising and proving a valid affirmative defense.  *See Alphin*, 809 F.2d at 238.

The O'Sheas present two arguments in opposition to the Government's effort to enforce the summonses.  First, the O'Sheas contend that an abuse of process has occurred.  They focus on the fourth good faith element, arguing that the summonses did not comport with the relevant provisions of the Internal Revenue Code, and on the second element, claiming that the Government has not shown the relevance of the summonses to a legitimate tax collection purpose.  Second, the O'Sheas attempt to invoke their Fifth Amendment right against self-incrimination as an affirmative defense to complying with the summonses.  Each of these arguments will be addressed in turn.

*A.  Abuse of Process*

The O'Sheas identify several purported legal errors with the Government's summonses. They first claim that they were improperly served with third-party summonses under 26 U.S.C. § 9609.  Second, they argue that the IRS has failed to provide an adequate explanation for why "any such third-party documents (if they exist) would be in [the O'Sheas'] possession, or have any relation to [the O'Sheas], or have any relation to tax claims (if any exist) against them, or have any relation to any potential collection action."  (Docket 5 at 7.)  Accordingly, they claim that the information the IRS sought to obtain by the summonses was not within the scope of the IRS's authority to summon under 26 U.S.C. § 7602(a).  Neither of these arguments sufficiently rebuts the Government's prima facie showing that the second and fourth good faith elements were satisfied.

Contrary to the O'Sheas' assertion, the summonses at issue were not third-party summonses. A third-party summons, by definition, is a summons issued to a person other than the taxpayer who is the target of the investigation.  *See* 26 U.S.C. § 7609(a)(1); 26 C.F.R. § 301.7602-2(b)(2).  The summonses issued to the O'Sheas were captioned "In the matter of Gerard O'Shea" and "In the mater of Kathnell O'Shea," respectively.  (Docket 1-3.)  Below the captions, each summons stated that it was "for the purpose of inquiring into any offense connected with the administration or enforcement of the internal revenue laws concerning the person identified above for the periods shown." (*Id.*)  Thus, each summons was unambiguously directed to the target of the investigation rather than to a third party.

4

The O'Sheas highlight the certification portion of the summonses as evidence that they were improperly served with third-party summonses.[3]  The certification portion of the summonses state, in part: "This certificate is made to show compliance with [26 U.S.C. §] 7609."  (Docket 1-3.) Section 7609 obligates the IRS to notify a taxpayer targeted by an investigation that the IRS has issued a summons to a third-party seeking records or information relating to the taxpayer.  26 U.S.C. § 7609(a); *see also United States v. Horton*, 452 F. Supp. 472  (C.D. Cal. 1978) ("The purpose of § 7609 . . . is to facilitate a taxpayer's opportunity to raise defenses to a third party summons.").  The inclusion of the certificate on the summons form does not, as the O'Sheas suggest, indicate that the form was intended for use only as a third-party summons.  The certificate's purpose is to permit the investigating officer to certify that the notice requirements of § 7609 were satisfied.  If the summons is issued to a subject taxpayer directly, as it was in this case, no notice is required by § 7609.  26 U.S.C. § 7609(c)(2).  Accordingly, because the summonses were issued to the O'Sheas with regard to their individual tax liabilities, Officer Yurick checked the box stating "No notice is required" and signed the certificates.  (Docket 1-3.)  By doing so, Officer Yurick certified that § 7609 was not applicable because the summonses were not being issued to a third party.

The O'Sheas next claim that the IRS exceeded the scope of its authority under 26 U.S.C. § 7602(a) by requesting information and documents relating to the trusts.  Section 7602(a) authorizes the IRS to obtain information and issue summonses

> [f]or the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax, or collecting any such liability.

---

[3]  The summonses were issued on IRS Form 2039, which were last revised in December 2001. (Docket 1-3.)

26 U.S.C. § 7602(a).  The O'Sheas argue that the IRS is seeking information and documents relating

to trust entities and has not adequately explained or alleged how such information relates to their tax

liability as individuals.  The O'Sheas would have this Court require too much of the IRS.

The IRS's "summons power should . . . be liberally construed in light of the purposes it

serves."  *Uhrig v. United States*, 592 F. Supp. 349, 352 (4th Cir. 1984) (quoting *Godwin v. United

States*, 564 F. Supp. 1209, 1212 (D. Del. 1983)).  As stated above, the IRS's investigatory authority

is inquisitory; the IRS need not demonstrate that it has probable cause to believe that a violation has

occurred in order to seek information.  The Court will not enforce a summons that appears to be a

groundless fishing expedition through taxpayer's records, but the IRS need only convince the Court

that it "has a 'realistic expectation rather than an idle hope that something may be discovered.'"

*United States v. Richards*, 631 F.2d 341, 345 (4th Cir. 1980) (quoting *United States v. Harrington*,

388 F.2d 520, 524 (2d Cir. 1968)).  This standard generally will be satisfied where the summons

pertains to "a legitimate investigation of an ascertainable target." *Tiffany Fine Arts, Inc. v. United

States*, 469 U.S. 310, 320 (1985).  Provided that the four good faith elements are satisfied, no greater

justification is required.

At the May 15 hearing, the Government stated that neither the O'Sheas nor the trusts at issue

had filed income tax returns in several years.  The Government further submitted that it had reason

to be believe that the G and K Trust and the Genesis Trust were abusive trust arrangements created

by the O'Sheas for the purpose of avoiding internal revenue taxes and that the trusts were generating

income on which the O'Sheas should be paying federal income tax.[4]  Deeds placed in the record by

---

[4]  The IRS's description of abusive trust arrangements, which was cited by the Government at the
hearing, is as follows:

(continued...)

6

the Government indicate that the O'Sheas conveyed several properties to the trusts, including their primary residence and the property on which they operate a hair salon and novelty business. (Docket 4 at 4.)   The deeds also reflect that the O'Sheas are the trustees of the trusts.   (*Id.*)   The Government's assertions and documentary evidence are more than adequate to convince the Court that the IRS is not on a groundless fishing expedition.

In a slight variation on their previous relevancy argument, the O'Sheas further argue that because the IRS is seeking trust documents, but not their personal records, the summonses are being used for a purpose not authorized by § 7602.  This argument is unavailing for many of the same reasons discussed above.  The IRS believes that the trust documents are in the O'Sheas' actual or constructive possession and that the documents relate to the internal revenue tax liability of the

---

[4](...continued)

      Abusive trust arrangements typically are promoted by the promise of tax benefits with no meaningful change in the taxpayer's control over or benefit from the taxpayer's income and assets.  The promised benefits may include reduction or elimination of income subject to tax; deductions for personal expenses paid by the trust; depreciation deductions of an owner's personal expenses paid by the trust; depreciation deductions of an owner's personal residence and furnishings; a stepped-up basis for property transferred to the trust; the reduction or elimination of self-employment taxes; and the reduction or elimination of gift and estate taxes.  These promised benefits are inconsistent with the tax rules applicable to the abusive trust arrangements . . . .

      Abusive trust arrangements often use trusts to hide the true ownership of assets and income or to disguise the substance of transactions.   These arrangements frequently involve more than one trust, each holding different assets of the taxpayer (for example, the taxpayer's business, business equipment, home, automobile, etc.), as well as interests in other trusts.  Funds may flow from one trust to another trust by way of rental agreements, fees for services, purchase and sale agreements, and distributions.  Some trusts purport to involve charitable purposes.  In some situations, one or more foreign trusts also may be part of the arrangement.

*Certain Trust Arrangements*, IRS Cumulative Bulletin Notice 97-24, 1997-16 I.R.B. 6 (Apr. 3, 1997), *available at* http://www.irs.gov/pub/irs-drop/pub_n_97.24.pdf.

O'Sheas.  Accordingly, the documents are subject to the IRS's broad power to summon and "examine any books, papers, records, or other data which may be relevant or material" to the investigation.  26 U.S.C. § 7602(a).  It is of no moment that the IRS may discover, by chance or by design, information about the tax liability of the two trusts or other unnamed individuals.  *See Tiffany Fine Arts*, 469 U.S. at 323–24.

The Court reiterates its finding from the Order to Show Cause entered on April 9, 2009: The Government has met its burden of making a prima facie showing that the summonses served on the O'Sheas were issued in good faith.  The Court further **FINDS** that the O'Sheas have not met their burden of disproving any of the four good faith elements demonstrated by the Government. Therefore, the summonses are presumptively enforceable.  However, the question remains to what extent, if any, the O'Sheas' reliance on the Fifth Amendment is proper.

### B.  Fifth Amendment Privilege

Due to the potential for routine tax investigations to lead to criminal prosecutions, the Fifth Amendment's Self-Incrimination Clause has long been recognized as a defense to IRS summonses. *See Mathis v. United States*, 391 U.S. 1, 4–5 (1968).  The scope of the Self-Incrimination Clause's protection extends broadly to any compelled disclosure that may later be used in a criminal prosecution of the speaker.  *Maness v. Meyers*, 419 U.S. 449, 461 (1975).  "The privilege afforded not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime."  *Hoffman v. United States*, 341 U.S. 479, 486 (1951). Assessing claims of Fifth Amendment privilege demands of the Court a degree of speculation and conjecture about the potential consequences of disclosure for the party claiming the privilege.  As

a consequence, there is no brightline rule for what is or is not within the ambit of the privilege. Rather, the Court "must be governed as much by [its] personal perception of the peculiarities of the case as by the facts actually in evidence." *Id.* at 487 (quoting *Ex parte Irvine*, 74 F. 954, 960 (C.C.S.D. Ohio 1896) (Taft, J.)).

The Fifth Amendment does not grant a blanket privilege to ward off any and all questioning by government authorities. *United States v. Rodriquez*, 706 F.2d 31, 37 (2d Cir. 1983). It may only be raised with respect to specific questions or requests for the production of documents or other evidence. Where it is obvious that those questions or requests for documents may be incriminatory, the Court will not compel the party to comply. Where the incriminatory nature of the request is not readily apparent, the party asserting the privilege bears the burden of justifying his reliance on the Self-Incrimination Clause. *United States v. Sharp*, 920 F.2d 1167, 1170–71 (4th Cir. 1990); *see also In re Morganroth*, 718 F.2d 161 (6th Cir. 1983).

In the present case, the O'Sheas have invoked the Self-Incrimination Clause to avoid the IRS's request to provide trust documents and to answer questions about the trusts. The Government contends that the O'Sheas have waived their right to assert the Fifth Amendment by failing to file timely responses to the Court's Order to Show Cause. The O'Sheas, as unrepresented parties, are to be given leeway for technical deficiencies in their attempts to assert the Fifth Amendment privilege. *Sharp*, 920 F.2d at 1170; *see also Colorado v. Spring*, 479 U.S. 564, 572 (1987) (noting that a valid waiver of rights under the Fifth Amendment must be "made voluntarily, knowingly and intelligently"). The O'Sheas' assertion of the privilege in this case was timely and persistent. It will not be deemed waived for no better reason than that they filed a late memorandum with the Court.

9

The O'Sheas' refusal to answer questions posed by the IRS is amenable to a traditional Fifth Amendment analysis, but their right to claim the privilege with regard to the trust documents implicates additional issues.  The claim of privilege as to each category of requested information will be discussed separately.

*(1) Trust Documents*

The fourteen words of the Self-Incrimination Clause,[5] like most provisions in the Constitution, epitomize the economic use of language.  It is no small irony then that the body of case law interpreting and applying the Self-Incrimination Clause should contain so many doctrines, rules, exceptions to rules, and, indeed, exceptions to exceptions.  The Self-Incrimination Clause has, in the words of future-Justice Samuel Alito, been "led into a realm of almost metaphysical abstraction." Samuel A. Alito, Jr., *Documents and the Privilege Against Self-Incrimination*, 48 U. Pitt. L. Rev. 27, 77–78 (1986).  Two venerable but still-evolving doctrines in the jurisprudence of the Self-Incrimination Clause—the act of production doctrine and the collective entity doctrine—govern the validity of the O'Sheas' claims of the Fifth Amendment privilege to resist the compelled production of trust documents.  Under the former doctrine, an individual can assert a Fifth Amendment privilege when the act of producing documents is testimonial and incriminatory, and under the latter doctrine, the custodians of records for collective entities cannot assert a Fifth Amendment privilege to resist the production of the entity's documents.  These doctrines, which will be explained in greater detail below, often are straightforward and complimentary in their application.  However, the facts of this

---

[5] "[N]or shall [any person] be compelled in any criminal case to be a witness against himself . . . ." U.S. Const., amend. V, cl. 3.

case are dissimilar in significant respects from the factual circumstances presented in many of the cases giving rise to these rules. The facts here test the boundaries of these rules.

The act of production doctrine permits individuals to resist the government's attempts to compel the individual to hand over documents in certain circumstances. According to this doctrine, the Self-Incrimination Clause may apply if the *act* of producing a document communicates potentially incriminating information independent of the contents of the document. *See United States v. Doe* (*Doe I*), 465 U.S. 605 , 612 (1984); *Fisher v. United States*, 425 U.S. 391, 410 (1976); *Curcio v. United States*, 354 U.S. 118, 125 (1957). "[T]he act of production could constitute protected testimonial communication because it might entail implicit statements of fact: by producing documents in compliance with a subpoena, the witness would admit that the papers existed, were in his possession or control, and were authentic." *Doe v. United States* (*Doe II*), 487 U.S. 201, 209 (1988). For the act of production to fall within the scope of the Fifth Amendment, the information tacitly conveyed must have the potential to be both "testimonial" and "incriminating." *Fisher*, 425 U.S. at 410. The production of documents is neither testimonial nor incriminating where "their existence, possession, and authentication are a 'foregone conclusion'" and "their production 'adds little or nothing to the sum total of the Government's information.'" *United States v. Stone*, 976 F.2d 909, 911 (4th Cir. 1992) (quoting *Fisher*, 425 U.S. at 411). Where, however, the government cannot independently verify the existence, possession, or authenticity of the requested documents, then the compelled production of those documents raises Fifth Amendment concerns. This point is best illustrated with examples.

In *United States v. Hubbell*, 530 U.S. 27 (2000), the government sought to subpoena broad categories of business and tax records from the defendant. The government did not identify the

11

documents sought with particularity; rather, it contended that as a "businessman," it was a "foregone conclusion" that certain types of business and tax records existed and were in the defendant's possession. *Id*. at 44. The Supreme Court rejected the government's argument, observing that the government "needed [the defendant's] assistance both to identify potential sources of information and to produce those sources," which "was tantamount to answering a series of interrogatories asking a witness to disclose the existence and location of particular documents fitting certain broad descriptions." *Id*. at 41. Accordingly, because the government had no independent knowledge of the location or existence of the documents sought, nor did the government have an independent source to authenticate the documents, the defendant could rely on the Fifth Amendment to resist the compelled production of the documents.[6] *Id*. at 44–45.

*Hubbell* can be contrasted to *United States v. Fisher*, 425 U.S. 391 (1976). In *Fisher*, the Supreme Court rejected a defendant's claim that the act of producing records in response to an IRS summons implicated the Fifth Amendment. The documents sought from the defendant had been prepared by his accountant, who could independently verify that the documents existed, that they had been given to the defendant, and that they were authentic. *Id*. at 411–13. Thus, the defendant in *Fisher* was not entitled to invoke the Fifth Amendment privilege to avoid the production of the requested documents. *Cf. Stone*, 976 F.2d at 911–12 (records relating to rental house could be obtained and authenticated by utilities and third-party rental agent); *United States v. Fishman*, 726

---

[6] *Hubbell* noted that the target of an investigation cannot rely on the Fifth Amendment if he has been granted use immunity pursuant to 18 U.S.C. §§ 6002, 6003. 530 U.S. at 45–46. The Government has not requested a use immunity order in this case, *see* 18 U.S.C. § 6003(a), so this exception to the Fifth Amendment privilege need not be discussed further. *See Doe I*, 465 U.S. at 616–17 (noting that courts cannot prospectively grant use immunity without a formal request from the government).

F.2d 125, 126–27 (4th Cir. 1983) (business records sought could be authenticated by the defendant's employees who prepared them).

The collective entity doctrine functions largely as an exception to the act of production doctrine. The Self-Incrimination Clause proscribes the use of governmental authority to compel an individual to produce "his *personal* papers and effects." *Bellis v. United States*, 417 U.S. 85, 87 (1974) (emphasis added). It provides little or no protection to an individual who refuses to produce the documents and records of others which happen to be in his possession. This principle applies to the documents and records of "collective entities," such as corporations and trusts,[7] that are in the possession of agents of the entity. Agents of such entities hold documents in a representative, rather than personal, capacity. *Braswell v. United States*, 487 U.S. 99, 109–10 (1998). The act of producing entity documents is considered an act of the entity, which can act only through its agents. *Id*. at 110. By function of this legal fiction, the act of production is not viewed as a personal act of the agent.

Individuals "assume the rights, duties and privileges of the artificial entity or association of which they are agents or officers." *United States v. White*, 322 U.S. 694, 699 (1944). The agent of a collective entity acting in a representative capacity can claim no greater right to resist a lawful summons than that possessed by the entity. Collective entities have no Fifth Amendment rights. *Braswell*, 487 U.S. at 110; *United States v. Wujkowski*, 929 F.2d 981, 983 (4th Cir. 1991). Thus, the agent of a collective entity asked to produce documents of the entity generally will find no shelter

---

[7] Although the Fourth Circuit has not had occasion to address the issue, other circuits have uniformly held that trusts are collective entities. *See, e.g.*, *In re Grand Jury Subpoena*, 973 F.2d 45, 47–49 (1st Cir. 1992); *Watson v. Comm'r*, 690 F.2d 429, 431 (5th Cir. 1982); *United States v. Harrison*, 653 F.2d 359, 361–62 (8th Cir. 1981); *In re Grand Jury Proceedings*, 633 F.2d 754, 757 (9th Cir. 1980).

in the Fifth Amendment—even if the act of production may incriminate the agent.  It is in this respect that the collective entity doctrine can be viewed as an exception to the act of production doctrine.  Taking the collective entity doctrine to its logical ends, it is of no Fifth Amendment consequence that the agent may be ordered to produce documents of the collective entity which may contain information that incriminates the agent personally.  *Bellis,* 417 U.S. at 88.  Likewise, the size of the entity has no effect on the agent's consequence to assert a Fifth Amendment privilege.  *White*, 322 U.S. at 101 ("It is well settled that no privilege can be claimed by the custodian of corporate records, regardless of how small the corporation may be."); *see also Bellis*, 487 U.S. 94–95 (declining to allow partner in three-person law firm to resist production of firm documents); *Amato v. United States*, 450 F.3d 46, 53 (1st Cir. 2006) (rejecting claim of Fifth Amendment privilege by the sole officer and employee of a corporation).

Notwithstanding the practical consequences of the collective entity doctrine, an individual is not divested of his personal Fifth Amendment rights simply because documents are requested of him in his representative capacity as an agent of a collective entity.  *Wujkowski*, 929 F.2d at 984.  Furthermore, every demand for documents from an agent of an entity does not fall neatly within the collective entity doctrine's exception to the act of production doctrine.  For example, the Fourth Circuit observed in *Wujkowski* that some entity documents such as "appointment books, day planners, and pocket calendars" are not "intrinsically either corporate or personal in nature," and government requests for their production may implicate their owner's privilege against self-incrimination.  *Id*.  Though the facts of *Wujkowski* are very different from those here, that case cautions that the act of production doctrine and collective entity doctrine are not mutually exclusive in their application.  There is enough play between the doctrines that factual circumstances may arise

14

where the collective entity doctrine applies, but it is limited to some extent by the agent's assertion of his Fifth Amendment rights by way of the act of production doctrine.

In the decisions holding that the custodian of a collective entity's record cannot resist a request to produce the records and documents of the entity, there was no question that the entity existed and that the target of the investigation was a representative of the entity at the time the summons or subpoena was issued. *See, e.g.*, *Braswell*, 487 U.S. at 100 (defendant was president and sole shareholder of "active corporations, maintaining their current status with the State of Mississippi"). A question not presented in those cases, and which is squarely presented here, is whether the Fifth Amendment applies to a circumstance where the act of production conveys a very important fact unknown to the government; namely, that the *entity* exists. Little is known about the purported trusts at issue here, the G and K Trust and the Genesis Trust. The sum total of the Government's knowledge about these trusts has been gleaned from three deeds which indicate that two properties were conveyed to "Gerard O'Shea and Kathnell O'Shea, as Trustees for the Genesis Trust," (Dockets 4-2, 4-4), and that a third property was conveyed to "Gerard O'Shea, Kathnell A. O'Shea and Kim J. O'Shea, Trustees of the G and K Trust," (Docket 4-3). The deeds were executed in 1997, 2002 and 1999, respectively, and describe properties located in Greenbrier County, West Virginia. From these isolated and uncorroborated references, the IRS apparently has concluded that the trusts are existent—i.e. that they are not fictitious entities—and that the O'Sheas were in control of the trusts at the time the summonses were issued.

Were it not for *Braswell*'s mandate "that the custodian of corporate records may not interpose a Fifth Amendment objection to the compelled production of corporate records, even though the act of production may prove personally incriminating," 487 U.S. at 111–12, the disposition of this

15

matter would be simple.  The act of complying with the summonses will compel the O'Sheas to divulge the contents of their minds as to a number of facts unknown to the Government.  Thus, the act of production would be testimonial.  Complying with the summonses would cause the O'Sheas to verify that the "papers existed, were in [their] possession or control, and were authentic." *Doe II*, 487 U.S. at 209.  Like the subpoena disapproved of in *Hubbell*, the IRS's summonses here do not identify the documents sought with "reasonable particularity"[8] and rely on the O'Sheas' "assistance both to identify potential sources of information and to produce those sources."[9]  530 U.S. at 41. Furthermore, this case involves the potential disclosure of types of information not addressed in the Supreme Court or Fourth Circuit's collective entity doctrine cases: compliance with the summonses will entail the O'Sheas confirming that the trusts exist and that the O'Sheas are presently associated with the trusts.

In addition to being testimonial, the information may be incriminating.  The IRS has tipped its hand by revealing that it believes the trusts are abusive tax-avoidance devices and that criminal prosecution is a possibility.  Therefore, there is little doubt that the information revealed by the act

---

[8]  The IRS is seeking a laundry list of information, correspondences, and documents relating to the G and K Trust and the Genesis Trust.  (Docket 1-3).

[9]  Commentators have suggested that *Hubbell* may mark the softening of *Braswell*'s unyielding view of the collective entity doctrine—i.e., that a corporate records custodian may resist a summons or subpoena on the grounds that the request is a fishing expedition that relies on the custodian's knowledge to locate and identify responsive documents.  *See, e.g.*, Lance Cole, *Reexamining the Collective Entity Doctrine in the New Era of Limited Liability Companies—Should Business Entities Have a Fifth Amendment Privilege?*, 2005 Colum. Bus. L. Rev. 1, 58–59 (2005).  This argument has been raised before several courts, where it has been rejected consistently.  *See, e.g.*, *Armstrong v. Guccione*, 470 F.3d 89, 98 (2d Cir. 2006); *United States v. Rinehart*, 539 F. Supp. 2d 1334, 1338 (W. D. Okla. 2008).  Consequently, this Court will not recognize an implied *Hubbell* exception to *Braswell* barring more concrete guidance from the Supreme Court or the Fourth Circuit.

16

of complying with the summonses could "furnish a link in the chain of evidence needed to prosecute the [O'Sheas] for a federal crime." *Hoffman*, 341 U.S. at 486.

The limits of the collective entity doctrine have been explored in a number of cases with facts analogous to those at hand.  In *In re Grand Jury Proceedings*, the Sixth Circuit was presented with the following question: "whether a tenant in common of real estate who, together with one of his co-tenants in common, has conducted the financial transactions related to the real property under an assumed name using a jointly controlled bank account, may claim the Fifth Amendment privilege . . . with respect to the records of those transactions."  576 F.2d 703, 703 (6th Cir. 1976).  The court found that the purported entity, known as "G and S Investment," was not a corporate or partnership entity under the laws of the state.  *Id*. at 707.  Nonetheless, the collective entity doctrine prevented the assertion of the Fifth Amendment privilege because the records related to the joint economic activity of the parties for which either party could act in a representative capacity.  *Id*. at 707–08.  Similarly, in *In re Two Grand Jury Subpoenae Duces Tecum*, the Second Circuit found that the collective entity doctrine applied to the records of two attorneys who had not yet formed a legal partnership under state law because they "held [themselves] out to the public and the legal community as a collective entity."  793 F.2d 69, 72 (2d Cir. 1986).  In *In re Grand Jury Proceedings*, the Ninth Circuit held that it is irrelevant under the collective entity doctrine that a trust may be considered a grantor-controlled "shell" entity.  633 F.2d 754, 757 (9th Cir. 1980).  In a similar vein, the First Circuit has held that a Massachusetts nominee trust, which is a form of real estate ownership that is often more akin to a joint tenancy than a "true" trust, falls within the collective entity doctrine.  *In re Grand Jury Subpoena*, 973 F.2d 45 (1st Cir. 1992).

17

A common thread running through the above-described cases is that the collective entity doctrine should apply to the records of persons who purport to act through collective entities even though there may be no true entity. Stated differently, when two or more persons act in concert to conduct some manner of business and attempt to exploit the benefits of a collective entity, the purported entity will be treated as a validly constituted entity for the purpose of the collective entity doctrine. As a consequence, any of the persons conducting business through the purported collective entity can be ordered to produce documents of the entity in a representative capacity.

Applying this principle to the facts of the present case, it is apparent that the collective entity doctrine applies to records of the purported trusts identified by the IRS. The O'Sheas have chosen to transact business as trustees of the G and K Trust and the Genesis Trust. They have held themselves out as trustees of the trusts in public documents and have enjoyed to the benefits of living on, and operating a business from, real property owned by the purported trusts. They should not be able to avoid the attendant responsibilities of that decision. *Cf. Stone*, 976 F.2d at 912. Whether the trusts are true independent trust entities under state law is irrelevant; due to the O'Sheas' actions, they will be treated as such. It follows, therefore, that it is immaterial that the IRS cannot independently verify the existence of the trusts or the O'Sheas' status as trustees. Because the collective entity doctrine applies and the O'Sheas can be compelled to produce trust documents in a representative capacity, it likewise does not matter that the contents of the trust documents may be incriminating or that the act of producing the documents may convey incriminating information.

There are, however, limitations on the how the government may use the O'Sheas' act of production against them. Even where the government relies on the act of production doctrine to compel an agent to produce entity records, the Fifth Amendment enjoins the government from

making "evidentiary use of the 'individual act' against the individual." *Braswell*, 487 U.S. at 118. The act of production doctrine is reconcilable with the Fifth Amendment's privilege against being a witness against oneself due to the fiction that the act of producing the documents is performed by the entity, not the agent. This fiction would become transparent if the government could, in a later prosecution, reveal to the jury that it received the incriminating evidence directly from the hands of the accused. *Id*. If the government is to rely on the fiction that the trusts are producing the documents in order to avoid the O'Sheas' claim of the Fifth Amendment privilege, it cannot drop that pretense when convenient and attribute the acts to the O'Sheas.

Having determined that the O'Sheas may be ordered to comply with summonses to produce documents on behalf of the G and K Trust and the Genesis Trust, the Court must examine the list of items sought by the IRS to determine which documents, if any, fall outside the scope of the collective entity doctrine. Several of the requests seek documents forming the trusts, documents pertaining to business conducted in the name of the trusts, or documents which would be generated in the regular course of operating the trusts. These documents are listed as numbers 1, 2, 3, 4, and 16 in the summonses. (Docket 1-3). The summonses are enforceable with respect to these documents.

A second category of requests seeks "documents, records, or information" pertaining to real properties and bank accounts. These requests, numbered 9, 10, 11, 12, 13, 14, and 15, are stated generally, without a distinction between trust and non-trust documents. The O'Sheas cannot be required to provide documents generated before the properties were conveyed to the trusts or documents relating to bank accounts generated before the accounts were transferred to, or opened in, the name of the trusts. Such records would be personal to the O'Sheas and the act of their

production may convey incriminating information.  Accordingly, these records would fall within the protection of the act of production doctrine.

Furthermore, the collective entity doctrine applies to documents created voluntarily—that is, documents not created in response to a summons or subpoena.  *See Doe I*, 565 U.S. at 610–11; *Fisher*, 424 U.S. at 409–10.  By requesting "information" related to the requested documents, it appears that the IRS may be seeking either oral testimony or the generation of new documents. Accordingly, the requests are not enforceable to the extent that they request these types of "information."  To the extent, however, that the requests numbered 9, 10, 11, 12, 13, 14, and 15 seek voluntarily prepared documents or records of the trusts, they are enforceable.

A third category of requests, numbers 7 and 8, seeks "All records pertaining to property in which the trust(s) have an interest" and "Insurance records."  These requests for records are enforceable, but subject to the same limitations as the documents requested in the second category. Thus, records which predate the transfer of property to the trusts or insurance records for policies taken out in either of the O'Sheas' names personally are not recoverable with these requests.

The last category of requests, numbers 5 and 6, seeks all "correspondence" between any persons involved with the trusts and with attorneys working on behalf of the trusts.  Both of these requests potentially implicate privileges which have not yet been raised.  The first of the two requests seeks all correspondences "between you and any other trustees, trustors, beneficiaries and any other persons involved with the trust(s)."  The only two persons known to be involved with the trusts, the O'Sheas themselves, are husband and wife.[10]  "[M]arital communications are presumptively

---

[10]  Kim O'Shea is listed as a trustee of the G and K Trust on one the deeds, (Docket 4-3), but her name appears nowhere else in the record.  At the hearing, Gerard O'Shea mentioned that his
(continued...)

confidential," *Blau v. United States*, 340 U.S. 332, 333 (1951), and may be privileged from compelled disclosure to the government, *see United States v. Euge*, 444 U.S. 707, 714 (1980) (stating that IRS summonses are "subject to the traditional privileges and limitations"). Similarly, with respect to the second request, confidential communications with an attorney may be privileged from IRS summonses. *See Upjohn Co. v. United States*, 449 U.S. 383 (1981). The marital communications and attorney-client privileges must be raised and proved by the party asserting them. The O'Sheas have not invoked either of these privileges thus far, relying solely on the Fifth Amendment. The Court is mindful of the fact that the O'Sheas are proceeding pro se and is therefore reluctant to find that they have impliedly waived important rights and privileges. Accordingly, the O'Sheas should be given an opportunity to assert the aforementioned privileges.

The O'Sheas shall have fourteen days from the entry of this Order to raise objections to the requests listed as numbers 4 and 5. If they fail to file timely objections with this Court, the requests will be enforceable, subject to the same limitations discussed with regard to the other requests. Correspondences not pertaining to the business or operation of the trusts need not be disclosed. Such non-trust documents would not fall within the collective entity doctrine and the IRS cannot recover them with such a broadly stated request that would require the O'Sheas' "assistance both to identify potential sources of information and to produce those sources." *Hubbell*, 530 U.S. at 41.

For the reasons explained above, and with the limitations expressed herein, the Court **FINDS** that the summonses issued to the O'Sheas are enforceable to the extent that they seek documents and records relating to the G and K Trust and the Genesis Trust.

---

[10](...continued)
daughter is deceased. It is unclear if he was referring to Kim O'Shea.

*(2) Testimony about Trusts*

The considerations that apply to the production of collective entity records do not apply in equal measure to compelled oral testimony about the entity. *Braswell*, 487 U.S. at 114. Unlike the legal fiction that the entity, rather than the individual, is performing the act of producing documents, an individual cannot be disassociated from his voice. Also unlike the act of producing documents, which is rarely testimonial, "[t]here are very few instances in which a verbal statement, either oral or written, will not convey information or assert facts." *Doe II*, 487 U.S.at 213. For this reason, an agent may be compelled to produce entity documents yet still be privileged from answering questions about the contents of the documents. *Curcio*, 354 U.S. at 124. Thus, the relevant inquiry is whether the information solicited by the question likely will be incriminatory.

"To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." *Hoffman*, 341 U.S. at 486–87. Where the incriminatory nature of the question is not readily apparent, the party may still invoke the Fifth Amendment by providing contextual evidence that the question will be incriminatory. *Sharp*, 920 F.2d at 1170. The O'Sheas were given the opportunity to provide contextual evidence that the IRS's questions would be incriminatory, but they have failed to do so in their briefs or at the May 15 hearing. Accordingly, the Court will review the proposed questions to determine if, in the context of this case, compelling the O'Sheas to provide responsive answers may force them to be witnesses against themselves in violation of their validly invoked Fifth Amendment rights. *See Wilson v. United States*, 221 U.S. 361, 385 (1911) ("[Custodians of records] may decline to utter upon the witness stand a single self-incriminating word.").

22

Questions numbered 1, 2, 4, 5, 8 and 9[11] are plainly incriminatory in the context of this case. Questions 4 and 5 inquire into the purpose of the trusts and ask why they were created. The IRS has indicated that it believes that the trusts were created as abusive tax-avoidance devices. If the IRS is correct in this belief, responsive answers to questions 4 and 5 would be tantamount to an admission of guilt.

Questions 1 and 2 seek information about who created the documents establishing the trusts. The IRS stated at the May 15 hearing that it suspects that the O'Sheas purchased trust packages from James DiLullo, who the IRS contends is a promoter of abusive trusts. Again assuming the IRS is correct in its belief about the origination and purpose of the trusts, compelling the O'Sheas to answer questions about their potential involvement with James DiLullo may furnish a link in the chain leading to their prosecution for perpetrating a scheme to avoid the payment of federal income taxes.

Question 8 asks the O'Sheas if the trusts file tax returns, and if not, it requests an explanation. The failure to file tax returns can be a misdemeanor punishable by up to one year in prison. 26 U.S.C. § 7203. It is likewise a felony to attempt to evade taxes "in any manner," 26 U.S.C. § 7201, such as through the use of sham trusts, *cf. United States v. Tranakos,* 911 F.2d 1422, 1431 (10th Cir. 1990); *Sandvall v. Comm'r*, 898 F.2d 455, 458 (5th Cir. 1990). If, as the IRS suggests, the O'Sheas transferred profit-generating assets to sham trusts and failed to file returns on behalf of the trusts, then the O'Sheas potentially face criminal liability under §§ 7201 and 7203, and possibly under other provisions of the Internal Revenue Code. Thus, the admission by the O'Sheas that the trusts did not file tax returns may be incriminatory as it could potentially result in the

---

[11] The questions are reproduced at Docket 4-6.

disclosure of an aspect of an unlawful tax-avoidance scheme.  Furthermore, the explanation of why the trusts have not filed tax returns may call for the O'Sheas to admit criminal intent.

Question 9 asks if the trusts pay the personal expenditures of the O'Sheas.  Such benefits would be considered income subject to federal taxation.  *See* 26 U.S.C. §§ 61, 63, 671.  The IRS has stated that the O'Sheas have not filed tax returns or paid federal income taxes in several years.  By answering the question, the O'Sheas may be admitting to receiving income on which they have not paid federal income taxes.  Thus, a truthful answer to the question may involve the compelled admission of a crime.  *See* 26 U.S.C. § 7203 ("Any person . . . who willfully fails to pay such estimated tax or tax . . . shall . . . be guilty of a misdemeanor . . . .").

The incriminatory nature of the remainder of the questions—numbers 3, 6, 7, 10, 11, and 12—is not is not as readily apparent as the others.  However, a closer examination reveals that they may be incriminatory nonetheless in the context of the issues raised in this discussion.  Each of these questions inquires into the establishment and operation of the trusts.  As was discussed previously, the IRS has not demonstrated to the Court that it can independently verify that the trusts exist.  The O'Sheas have refrained from confirming or denying the existence of the trusts thus far.  Through the act of producing trust documents in a representative capacity, the O'Sheas may supply the IRS with information that may help the Government build a criminal case against the O'Sheas.  However, under the collective entity doctrine, the trust entities rather than the O'Sheas personally are considered the source of the information.  Although the O'Sheas cannot prevent the production of the documents as agents, they retain their rights as individuals to interpose the Fifth Amendment between themselves and the IRS's attempts to have them provide incriminating testimony.  *See Curcio*, 354 U.S. at 124; *Wilson*, 221 U.S. at 385.  Moreover, the IRS can obtain much, if not all, of

24

the information sought by these questions through the production of the requested documents.  The Court need not "subject [the O'Sheas] to possible incrimination in exchange for paltry returns." *Winchester Assocs. v. Gould*, 85 Civ. 2246 (MJL), 1985 U.S. Dist. LEXIS 16981 at *10, 1985 WL 2307 at *3 (S.D.N.Y. Aug. 9, 1985).  Consequently, the O'Sheas may refuse to answer questions 3, 6, 7, 10, 11, and 12 at this time.[12]

Due to the O'Sheas' valid assertion of the Fifth Amendment privilege against self-incrimination, the Court **FINDS** that summonses at issue are not enforceable to the extent that they require the O'Sheas to provide oral testimony about the G and K Trust and the Genesis Trust.

*III.  CONCLUSION*

For the foregoing reasons and with the limitations set forth above, the Government's Petitions [Docket 1] are **GRANTED IN PART** and **DENIED IN PART**.

Pursuant to 26 U.S.C. § 7604(b), and with the exceptions and limitations noted above, the O'Sheas are **DIRECTED** to comply with the administrative summonses served by Officer Yurick on October 2, 2008.   To wit, the O'Sheas shall provide all trust documents and records requested in numbers 1 through 4 and 7 through 16 in Docket 1-3.  However, the O'Sheas need not provide documents and records not related to the trusts.  The O'Sheas also cannot be compelled to generate new documents to comply with the summonses.

The O'Sheas shall have fourteen days from the entry of this order to assert any privileges with respect to the document requests numbered 5 and 6 in Docket 1-3 by filing objections with this

---

[12]  The analysis may change, of course, if the IRS develops independent knowledge of the existence and operation of the trusts.

Court.  Failure to assert such privileges will be construed as a waiver of those privileges and the summonses will be enforceable with respect to these documents.

The O'Sheas need not provide oral testimony with regard to the questions reproduced in Docket 4-6.

Failure by the O'Sheas to comply with the administrative summonses, as limited by this Order, is punishable as contempt by monetary fines and/or imprisonment.  26 U.S.C. § 7604; *see also* 18 U.S.C. § 401.

The rulings contained in this Order will not be enforceable until the Court enters a separate Judgment Order.  A Judgment Order will enter when the O'Sheas' objections to document requests numbered 5 and 6 in Docket 1-3 are resolved, when the Government abandons the aforementioned document requests, or when fourteen days have passed without objection by the O'Sheas, whichever comes sooner.

**IT IS SO ORDERED.**

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.    The Court further **DIRECTS** the Clerk to publish this opinion on the Court's website at http://www.wvsd.uscourts.gov.

ENTER:        September 8, 2009

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE